**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| CHANNING STREET COPPER COMPANY,    ) | |
| ) | |
| Plaintiff,    ) | |
| ) | C.A. No. |
| v.    ) | |
| ) | **JURY TRIAL DEMANDED** |
| IMPULSE LABS, INC.,    ) | |
| ) | |
| Defendant.    ) | |

## COMPLAINT

Plaintiff Channing Street Copper Company ("Plaintiff" or "Copper") hereby alleges against Defendant Impulse Labs, Inc. ("Defendant" or "Impulse") as follows:

## NATURE OF THE ACTION

1.      This is a civil action for infringement of U.S. Patent No. 11,870,263 ("the '263 Patent"), U.S. Patent No. 12,191,667 ("the '667 Patent"), and U.S. Patent No. 12,199,435 ("the '435 Patent") (collectively, "the Asserted Patents").

2.      Copper is the owner of the Asserted Patents, which were duly and legally issued by the United States Patent and Trademark Office ("USPTO").  For each of the Asserted Patents, Copper owns all substantial rights to sue for infringement, including for past, present, and future damages, and injunctive relief.  Through this action, Copper seeks to vindicate its patented rights to valuable technology that it developed through substantial time, money, resources, and effort.

3.      Defendant Impulse has infringed and continues to infringe, has induced and continues to induce infringement, and has contributed to and continues to contribute to infringement, one or more claims of the Asserted Patents by making, using, importing, offering for sale, and/or selling the Accused Products, as defined and explained below.

**THE PARTIES**

4.      Plaintiff Copper is a Delaware corporation with its principal place of business at 2827 Seventh Street, Berkeley, California 94710.

5.      Defendant Impulse is a Delaware corporation with its principal place of business at 101 15th Street, San Francisco, California 94103.

**JURISDICTION AND VENUE**

6.      This is a civil action for infringement arising under the patent laws of the United States, 35 U.S.C. § 101, *et seq.*

7.      This Court has subject matter jurisdiction over the patent claims alleged in this action pursuant to 28 U.S.C. §§ 1331 and 1338 because this action arises under the patent laws of the United States, including 35 U.S.C. § 101, *et seq.*

8.      This Court has personal jurisdiction over Impulse because Impulse is incorporated in Delaware, engages in continuous and systematic business activities in this district, and because it has committed acts within this district giving rise to this action.  Impulse has committed and continues to commit acts of infringement in this district by, among other things, making, using, importing, offering to sell, and/or selling products that infringe the Asserted Patents.  Impulse has substantial, continuous, and systematic contacts with this state, and has solicited business in, transacted business within, and attempted to derive financial benefit from residents of this state on a substantial basis.

9.      Venue is proper in this Court under 28 U.S.C. § 1400(b) because Impulse is incorporated in Delaware and resides in this district.

## BACKGROUND

10.    This Complaint brings causes of action for patent infringement of the '263 Patent, the '667 Patent, and the '435 Patent.

### Copper and Its Asserted Patents

11.    Copper was founded in Berkeley, California by a team of scientists and engineers to build appliances that enable access to clean energy.  By embedding batteries directly into household appliances and creating a network of energy storage enabled ("ESE") appliances, Copper aims to eliminate barriers to electrification, reduce greenhouse gas emissions, and promote public health and well-being.  Copper's founders began developing solutions as early as 2019 and Copper itself was incorporated in Delaware on August 18, 2022.

12.    By early 2023, Copper began manufacturing ESE induction stoves and installing them in pilot homes.  In December 2023, Copper had its first sale of an ESE appliance that was installed in a customer's home.  "Charlie" (pictured below) is the world's first ESE induction electric range and is offered for purchase and delivery throughout the contiguous United States. Charlie has been the subject of industry praise and has been featured in Bloomberg, the New York Times, CNBC, the Associated Press, Wirecutter, NPR, and the Wall Street Journal.



(https://copperhome.com/products/charlie.)

13.     Copper has several patents relating to the technology it has developed.  Copper filed a provisional patent application No. 63/159,851 ("the '851 Provisional") on March 11, 2021.  The applications that later issued as the '263 Patent, the '667 Patent, and the '435 Patent claim priority to that '851 Provisional.

### A.     The '263 Patent

14.     The '263 Patent is entitled "Appliance Level Battery-Based Energy Storage." Copper is the applicant and Saul Thomas Griffith, Samuel Eli Calisch, Joshua Land, and Tucker Gilman are the named inventors.  On January 9, 2024, the USPTO issued the '263 Patent from Application No. 17/692,714, filed on March 11, 2022, which claims priority to the '851 Provisional, filed on March 11, 2021.  A true and correct copy of the '263 Patent is attached as **Exhibit A**.  All claims of the '263 Patent claim patent-eligible subject matter and are valid and enforceable.  All claims of the '263 Patent are entitled to the filing date of the '851 Provisional.

4

15.     Copper owns all rights, title, and interest in and under the '263 Patent, including the full and exclusive right to sue and obtain damages for past, current, and future infringement. Copper thus has standing to sue for infringement of the '263 Patent.  Impulse does not have a license to the '263 Patent, either expressly or implicitly, and does not enjoy or benefit from any rights in or to the '263 Patent.

16.     Claim 12 of the '263 Patent claims:

A powered building system comprising:

an electric power distribution system configured to distribute electrical power to a plurality of receptacles;

one or more load sources; and

one or more battery systems associated with:

a respective receptacle of the plurality of receptacles, and

a respective load source of the one or more load sources,

wherein the one or more battery systems include:

a first battery system that is disposed within a first load source of the one or more load sources, the first load source comprising a first power cord plugged into a first receptacle of the plurality of receptacles, the first battery system comprising a first battery configured to obtain and store power from the first receptacle, the first load source being configured to be fully powered by power stored by the first battery and configured to be fully powered by power obtained from the first receptacle and configured to be partially powered by both the first battery and power obtained from the first receptacle.

### B.     The '667 Patent

17.     The '667 Patent is entitled "Appliance Level Battery-Based Energy Storage." Copper is the applicant and Saul Thomas Griffith, Samuel Eli Calisch, Joshua Land, and Tucker Gilman are the named inventors.  On January 7, 2025, the USPTO duly issued the '667 Patent from Application No. 18/803,321, filed on August 13, 2024, which claims priority through a chain of continuations to the application that issued as the '263 Patent, which claims priority to the '851

Provisional, filed March 11, 2021. A true and correct copy of the '667 Patent is attached as **Exhibit B**. All claims of the '667 Patent claim patent-eligible subject matter and are valid and enforceable. All claims of the '667 Patent are entitled to the filing date of the '851 Provisional.

18.     Copper owns all rights, title, and interest in and under the '667 Patent, including the full and exclusive right to sue and obtain damages for past, current, and future infringement. Copper thus has standing to sue for infringement of the '667 Patent. Impulse does not have a license to the '667 Patent, either expressly or implicitly, and does not enjoy or benefit from any rights in or to the '667 Patent.

19.     Claim 11 of the '667 Patent claims:

A powered building system comprising:

an electric power distribution system configured to distribute electrical power to a plurality of receptacles;

one or more load sources; and

one or more battery systems associated with:

a respective receptacle of the plurality of receptacles, and

a respective load source of the one or more load sources,

wherein the one or more battery systems include:

a first battery system associated with a first load source and a first receptacle of the plurality of receptacles, the first battery system comprising a first battery configured to obtain and store power from the first receptacle of the plurality of receptacles, the first load source configured to operate with power obtained from both the first battery and the first receptacle and also configured to operate with power obtained solely from the first receptacle.

**C.     The '435 Patent**

20.     The '435 Patent is entitled "Appliance Level Battery-Based Energy Storage." Copper is the applicant and Saul Thomas Griffith, Samuel Eli Calisch, Joshua Land, and Tucker Gilman are the named inventors. On January 14, 2025, the USPTO duly issued the '435 Patent

from Application No. 18/803,295, filed on August 13, 2024, which claims priority through a chain of continuations to the application that issued as the '263 Patent, which claims priority to the '851 Provisional, filed March 11, 2021. A true and correct copy of the '435 Patent is attached as **Exhibit C**. All claims of the '435 Patent claim patent-eligible subject matter and are valid and enforceable. All claims of the '435 Patent are entitled to the filing date of the '851 Provisional.

21.    Copper owns all rights, title, and interest in and under the '435 Patent, including the full and exclusive right to sue and obtain damages for past, current, and future infringement. Therefore, Copper has standing to sue for infringement of the '435 Patent. Impulse does not have a license to the '435 Patent, either expressly or implicitly, and does not enjoy or benefit from any rights in or to the '435 Patent.

22.    Claim 11 of the '435 Patent claims:

A powered building system comprising:

an electric power distribution system configured to distribute electrical power to a plurality of receptacles;

one or more load sources; and

one or more battery systems associated with:

a respective receptacle of the plurality of receptacles, and

a respective load source of the one or more load sources,

wherein the one or more battery systems include:

a first battery system associated with a first load source and with a first receptacle of the plurality of receptacles, the first battery system comprising a first battery configured to obtain and store power from the first receptacle of the plurality of receptacles, the first load source configured to operate with power obtained from both the first battery and the first receptacle. [1]

---

[1] Claim 12 of the '263 Patent, claim 11 of the '667 Patent, and claim 11 of the '435 Patent are collectively the "Asserted Claims."

**D.      The Asserted Patents**

23.      The Asserted Patents are directed to improvements in energy storage and distribution systems.  They disclose an electric power distribution system configured to distribute electrical power to receptacles and load sources at those receptacles equipped with battery systems. Ex. A, Abstract.  Induction stoves, among other appliances, are identified as appliances that can be equipped with battery systems.  Ex. A at 4:42-45.

24.      For example, Figure 3a (below) depicts a "stove load source that comprises a battery system that can be an internal component of the stove, an integral component of the stove, disposed within a housing of the stove, or the like."  *Id*., 2:40-43.  In this embodiment, the power distribution system 150 can provide power to the receptacle 165 via powerlines 155, where the receptacle 165 is disposed on a wall of a building.  *See id*., 7:37-41.  Here, "[t]he stove 125 can plug into the receptacle 165 which can provide electrical power to the stove 125 and the battery 305 of the battery system 300, which can be configured to store electrical power and/or provide electrical power to the stove 125."  *Id*., 7:41-45.



*Id*., Figure 3a.

8

25.     As another example, Figure 3c (below) depicts a "battery system having a battery and a power cord with a plug, where the battery system can be a unit disposed between the stove load source and a receptacle that is part of a power distribution system." *Id*., 2:49-53.



*Id*., Figure 3c.

26.     The Asserted Patents are Copper's intellectual property.  Copper has developed and commercialized products, like its induction stove Charlie, relating to this patented technology.

**Impulse, the Impulse Cooktop, and Impulse's Infringement**

27.     Impulse has infringed and continues to infringe one or more claims of the '263 Patent, one or more claims of the '667 Patent, and one or more claims of the '435 Patent by making, using, selling, and/or offering for sale within the United States and/or importing into the United States products that are configured to infringe at least one of the claims of the Asserted Patents when installed and used for their intended purpose.  This includes all products integrating, connected to, or otherwise powered by the Impulse Core (https://www.impulselabs.com/platform) and marketed, commercialized, offered for sale, or sold by Impulse, including, but not limited to, the Impulse Cooktop (collectively, the "Accused Products").

9

28.    On information and belief, in or around January 2024, Impulse announced the release of its Impulse Cooktop and began offering it for sale and selling it.  Impulse continues to develop and market the Impulse Cooktop.  Impulse has stated that its products, beginning with the Impulse Cooktop, are intended to electrify homes and transform the power distribution systems in homes.  On information and belief, in or around August 2025, Impulse began shipping, delivering, and installing battery-integrated appliances—namely, the Impulse Cooktop.

29.    Impulse states on its website, under "Transforming the Home," that "[b]attery-integrated appliances provide power when and where you need it." (https://www.impulselabs.com/about.)  According to Impulse, these battery-integrated appliances build energy reserves into a user's home or building, which allows power to flow through the home as needed without the need for a separate and costly battery system.



(https://www.impulselabs.com/about.)

30.    The Impulse Accused Products are battery-integrated appliances.  The appliances, such as the Impulse Cooktop, comprise a load source with an associated batter system, power cord, and are designed to plug into outlets or receptacles in homes.  Its battery draws or obtains power

10

from the outlet or receptacle and stores that power. The Accused Products are designed to plug into an outlet of a user's home or building. According to Impulse, the Impulse Cooktop is an induction stove with an "integrated battery" that "conveniently works with 120 V and 240 V" outlets. (https://www.impulselabs.com/product.) The battery system obtains and stores power from an electrical grid that the Accused Products are plugged into.

31.    Impulse states that the "Impulse Cooktop is a step towards the energy independent home, where appliances across your house double as energy reserves." Impulse describes the Impulse Cooktop as "a battery-integrated induction stove that can be plugged into just about any American kitchen without any upgrades." The Impulse Cooktop "conveniently works with 120 V and 240 V" outlets in a standard home and charges the battery.

> At Impulse, we built a battery-integrated induction stove that can be plugged into just about any American kitchen without any upgrades. This battery can charge during off-peak times and then, when your utility sends you a notification that it's time to stop usage, you can simply run the stove on the already-charged battery. Not every appliance is battery-integrated (yet), but it's a powerful way to reduce your strain on the grid, save money, and still use your appliances when you want to.

(https://www.impulselabs.com/blog/demand-response-made-easy.)

> Even with an integrated battery and built-in inverter, the Impulse cooktop fits into almost any standard countertop. And it conveniently works with 120 V and 240 V.

(https://www.impulselabs.com/product)

32.    Impulse advertises that its Impulse Cooktop has "[a] powerful integrated battery + state of the art induction."

11





(https://www.impulselabs.com/about.)

33.    Impulse advertises that the Accused Products have an integrated battery and a built-in inverter. "A custom LFP battery pack turns every appliance into a distributed energy asset. Products charge intelligently, deliver peak power from stored energy, and support demand response and time-of-use optimization — all from a standard 120V outlet."



(https://www.impulselabs.com/platform.)

34.     The Accused Products connect to a receptacle in an electric power distribution system that is configured to distribute power to a plurality of receptacles.  The Impulse Cooktop "simply plugs into the outlets you already have in your kitchen."

> But at Impulse, we've built a stove that simply plugs into the outlets you already have in your kitchen. This means you don't have to tear down any walls or install a new panel in your house: you just plug and play.

(https://www.impulselabs.com/blog/plug-and-play-electrification.)

35.     The Accused Products are each a load source with a battery system and are plugged into an associated receptacle.  Impulse explains that "a load is any device or appliance that uses electricity."

### What is a "load" and how is it shifted?

> To keep things simple, a load is any device or appliance that uses electricity: your TV, your iPhone charger, your dishwasher. Just like your appliances have physical weight, they also have a "weight" on the grid — meaning they all use different amounts of energy.

(https://www.impulselabs.com/blog/what-load-shifting-actually-means.)

13

36.     Impulse advertises that the Accused Products have an integrated battery and a built-in inverter.  Each product's integrated battery is part of a battery system associated with the respective product (the respective load source).



(https://www.impulselabs.com/platform.)



(https://www.impulselabs.com/product.)

37.     According to Impulse, the Accused Products are configured to operate from power obtained from the battery system and/or from the receptacle.  For example, the Impulse Cooktop's

integrated battery, when fully charged, can power the stove for at least three meals without additional energy sources.  (https://www.impulselabs.com/product-with-variants.)  Impulse states that its battery is a "Lithium Iron Phosphate (LFP)" battery, which are "commonly referred to as 'Lithium-ion' batteries."  (https://www.impulselabs.com/faqs.)

> At Impulse, we built a battery-integrated induction stove that can be plugged into just about any American kitchen without any upgrades. This battery can charge during off-peak times and then, when your utility sends you a notification that it's time to stop usage, you can simply run the stove on the already-charged battery. Not every appliance is battery-integrated (yet), but it's a powerful way to reduce your strain on the grid, save money, and still use your appliances when you want to.

(https://www.impulselabs.com/blog/demand-response-made-easy)

> How long will the battery work during an outage?                                    –
>
> The 3 kWh battery can power the stove for at least three meals on a full charge, helping you get through power outages. Counterintuitively, many gas stoves don't work during outages due to safety features that require electricity to enable the gas valves and light the ignition.

(https://www.impulselabs.com/faqs)

38.     The Troubleshooting guide explains that if the stove does not turn on, the user should both "[e]nsure the cooktop is connected to wall power" and "[e]nsure battery integration matches instructions."  Both the battery and the power supply to the outlet are connected to the stove.  The Impulse Cooktop User Interface guide states that "[w]hen an update is available, the stove automatically downloads and installs the update overnight while connected to wall power and Wi-Fi."

39.     In an interview with ARK Invest available on YouTube, Sam D'Amico, the founder and CEO of Impulse, stated: "The goal here is that the stove use case is kind of the bait to get the battery into your house in some cases—like if you're thinking of a Trojan horse analogy … Now once it's in your house, we've snuck a battery into your house and we can do a lot of the same

15

things that all these energy storage companies can do." *The Tesla of Appliances? Impulse Labs' CEO Sam D'Amico*, ARK Invest, https://www.youtube.com/watch?v=9C3G9yAHP3Y, at 20:20-22:15.   In that interview, Impulse's stated its goal is to build more appliances with integrated batteries that can be installed in residential homes.  Impulse's FAQs page states: "We plan to build battery-integrated versions of other major appliances. We also intend for multiple products to be able to coordinate their individual battery storage into a combined whole-home battery solution." (https://www.impulselabs.com/faqs.)  This further demonstrates Impulse's stated similarities with the inventions of Copper's Asserted Patents.

40.   Indeed, Copper's Asserted Patents have been a consistent impediment to Impulse's attempts to get patent applications granted by the USPTO, as discussed further below.

## Impulse's Actual Knowledge of Copper's Asserted Patents

41.   Impulse had actual knowledge of the '263 Patent prior to January 26, 2024, as evidenced by an Information Disclosure Statement submitted by Impulse at the onset of prosecution of Impulse's U.S. Patent Application No. 18/424,557 ("the Impulse '557 Application").  That Information Disclosure Statement cited only six references, and Copper's issued '263 Patent was one of those six references Impulse cited.

42.   On September 16, 2024, the USPTO issued a non-final rejection of all 20 pending claims of the Impulse '557 Application solely because they were anticipated under 35 U.S.C. § 102(a)(1) by the published application for Copper's '263 Patent, with Griffith as the first named inventor (U.S. Patent Pub. No. 2022/0344941) ("Griffith").  The Examiner concluded: "With respect to claims 1, 12 and 16, Griffith et al, (Hereinafter, Griffith) discloses a system for intelligent power management (Para. # 0003; see reproduced Fig. 1 drawing), comprising: an appliance (Fig. 2; Para. # 0036-0037); a battery module coupled to the appliance (Para. # 0041 and 0050, the

battery module being configured to provide power to the appliance (Para. # 0052); a bidirectional converter coupled to the appliance and the battery module by a power bus (Para. # 0108), the directional converter converting between alternating current (AC) and direct current (DC) and interfacing with a power infrastructure external to the appliance (Para. # 0127); and a control unit communicatively coupled to the battery module, the bidirectional converter, and the appliance, the control unit being configured to determine a charge and discharge schedule for the battery module (Para. # 0104, 0100 and 0101)." Copper's '263 published patent application was the only prior art reference the Examiner mentioned in this non-final rejection of Impulse's '557 Application.

43. On December 16, 2024, Impulse then submitted Applicant Arguments/Remarks attempting to overcome the Griffith reference that had anticipated all of its claims. Impulse added a limitation to independent claim 1 and attempted to explain how the Copper '263 Patent's published application did not disclose that limitation.

44. On January 24, 2025, the Examiner again rejected Impulse's pending claims in a Final Rejection, this time because they were rendered obvious under 35 U.S.C. § 103 by Griffith and another reference. On July 23, 2025, Impulse responded to that Examiner rejection with another amendment and argument attempting to explain why the Copper '263 Patent's published application did not render obvious its newly amended limitations.

45. On August 6, 2025, the Examiner issued yet another non-final rejection, citing the same obviousness combination, highlighting once again that Griffith and another prior art reference rendered obvious Impulse's '557 Application. On January 6, 2026, Impulse responded to that Examiner rejection with another amendment and argument attempting to explain why the Copper '263 Patent's published application did not render obvious its newly amended limitations.

17

46.    In addition, Impulse filed another U.S. Patent Application No. 18/095,817 ("the Impulse '817 Application") on January 11, 2023.  This application too was the subject of a non-final rejection based on anticipation under 35 U.S.C. § 102(a)(2), in which the Examiner found that Griffith (yet again) anticipated all the claims of the Impulse '817 Application.  On September 25, 2025, the Examiner explained in over ten pages of analysis how Griffith anticipated and/or rendered obvious all the limitations of Impulse's proposed claims. On January 6, 2026, Impulse responded to that Examiner rejection with another amendment and argument attempting to explain why the Copper '263 Patent's published application did not invalidate its newly amended limitations.

47.    Impulse's extensive experience with Copper's '263 Patent (via Griffith) during prosecution of its own patents provided actual knowledge of Copper's '263 Patent at least by Impulse's Information Disclosure Statement of January 2024.  In addition, Copper and Impulse are direct competitors developing induction stovetop solutions, attend the same industry conferences, and are aware of each other's products and technology.  In addition, by the time of the Final Rejection of the Impulse '557 Application on January 24, 2025, all three of Copper's Asserted Patents had issued (the '667 Patent issued January 7, 2025, and the '435 Patent issued January 14, 2025).  The '667 and '435 Patent are continuations of a chain of continuations to the application for the '263 Patent, and claim priority to the same '851 Provisional application.  On information and belief, Impulse also had actual knowledge of Copper's '667 and '435 Patents, as well as the '263 Patent, at least by January 2025.

48.    Impulse, unlike Copper, has no issued United States patents.  Impulse has had difficulty convincing the USPTO to approve its pending patent application claims and issue them as approved patents.  Examiners have rejected Impulse's patent application claims as anticipated

or rendered obvious by Copper's patent application publication that became the '263 Patent asserted in this case, which further indicates Impulse's use of Copper's patented technology.

**Impulse's Indirect Infringement**

49.    Impulse instructs its customers and intermediaries to practice the Asserted Claims by using the Accused Products in an electric power distribution system—particularly in a home or building.



(https://www.impulselabs.com/about.)

50.    Impulse actively induces end users and intermediaries by knowingly encouraging and instructing installation and use of the Accused Products in a home/building with an electrical power distribution system or network with multiple outlets or receptacles.  Impulse specifically instructs its customers and intermediaries to infringe the Asserted Patents.  For example, Impulse markets and advertises the Accused Product on its website as "easy [to] install" within a home/building.

19



Easy install without any electrical panel upgrades.

Even with an integrated battery and built-in inverter, the Impulse cooktop fits into almost any standard countertop. And it conveniently works with 120 V and 240 V.

(https://www.impulselabs.com/product.)

51.    In another example, Impulse instructs its customers through its installation guide, which is designed to instruct, encourage, enable, and facilitate users to practice the claims of the Asserted Patents. Impulse instructs users to operate the Accused Products by connecting them to the electrical power distribution system of the home via outlets and receptacles.

**5.2.ASSEMBLING THE POWER CABLE**

The stove arrives with the 120 V cable assembled. A 240 V cable is provided separately.

**FOR 120 V CONNECTION**
> The stove arrives with the 120 V cable assembled. If the 120 V cable needs to be re-assembled, follow the instructions below.
> **STEP 1:** Remove the 3 screws holding the ring terminals. Keep the screws in a safe place for reinstallation. **[Figure.19]**
> **STEP 2:** Match the 120 V wiring to the diagram labeled on the stove and in **[Table 1]**. Use the saved screws to fasten ring terminals. Torque screws to 35 – 50 in-lbs.
> **STEP 3:** Align the terminal panel to the underside of the cooktop according to the diagram. Ensure the tabs are fully seated in the corresponding holes in the terminal panel. Secure the terminal panel using a cross-head screwdriver and 4 panel screws. **[Figure.17]**
> **STEP 4:** After completing remaining assembly steps and installing the cooktop into the countertop, connect the 120 V plug to the power supply.

**FOR 240 V CONNECTION**
**CAUTION**
> **STEP 1:** Verify stove is not plugged in and the power supply is shut off.
> **STEP 2:** Before installing, turn power OFF at the service panel.
> **STEP 3:** Lock service panel to prevent power from being turned ON accidentally.
> **STEP 4:** Disconnect the 120 V cable:
> Remove the 4 screws securing the terminal panel using a cross-head screwdriver. Keep the screws in a safe place for reinstallation in step 5. **[Figure.16]**
> Remove the 3 screws holding the ring terminals and detach the 120 V cable.
> **STEP 5:** Match the 240 V wiring per the diagram next to the panel on the stove and in **[Table 1]**. No neutral (grounded conductor) is required for 240 V connections. Use the saved screws to fasten ring terminals. Torque screws to 35 – 50 in-lbs. **[Figure.20]**
> **STEP 6:** Align the terminal panel to the underside of the cooktop according to the diagram. Ensure the tabs are fully seated in the corresponding holes in the terminal panel. Secure the terminal panel using a cross-head screwdriver and 4 panel screws. **[Figure.18]**

(The Impulse Cooktop Installation Guide at 25, *available at* https://support.impulselabs.com/Installation-Guide-232fa276f8e4809d8b8df9ca357e0e45.)

52.     Impulse also instructs its customers to practice the Asserted Patents by offering installation videos.  (*See* https://www.youtube.com/watch?v=Q7hbduPERCM.)

53.     Impulse has been and is now also contributorily infringing the Asserted Patents in violation of 35 U.S.C. § 271(c).  For example, Impulse has been offering to sell or selling the Impulse Cooktop and other Accused Products in the United States.  The Impulse Cooktop constitutes a material part of the invention claimed in each of the Asserted Patents, is especially made or especially adapted for use in infringing the Asserted Patents, and is not a staple article or

commodity of commerce suitable for substantial non-infringing use. When the Impulse Cooktop and Accused Products are used for their intended purpose in their intended context as a home appliance connected to the home's power outlets, they infringe the Asserted Patents and have no substantial non-infringing use.

54.     For example, the Impulse User Manual under "Intended Use" states that "[t]he appliance can only be used safely if it is correctly installed according to the installation instructions," and to "[o]nly use this appliance to prepare meals and drinks, and in private households or enclosed spaces in a residential environment." (*See* https://support.impulselabs.com/Use-Care-Manual-232fa276f8e480aab00ef902b4b7a224?pvs=25.) It also tells users to "[o]nly use this appliance in its intended form with the battery attached. The cooktop should never be used without the battery installed." *Id*.

55.     The Accused Products have no substantial use other than to practice one or more claims of the Asserted Patents. Once the Accused Products are installed and/or used by the end user, as instructed, encouraged, configured, and designed by Impulse, one or more claims of the Asserted Patent are being practiced. The Accused Products are not a staple article or commodity of commerce suitable for substantial non-infringing use. Rather, the Accused Products are configured and enabled to practice the Asserted Claims once they are installed and used as Impulse has intended.

## FIRST CLAIM FOR RELIEF

### (INFRINGEMENT OF THE '263 PATENT)

56.     Copper repeats and re-alleges the allegations set forth above as if repeated herein.

22

57. The United States Patent and Trademark Office fully and legally issued the '263 Patent on January 9, 2024.

58. Impulse has been and is now directly infringing one or more claims of the '263 Patent in violation of 35 U.S.C. § 271(a) at least when it tests or otherwise uses the Accused Products as a load source in an electric power distribution system, including when Impulse puts the system of at least claim 12 into service, controlling the system as a whole and obtaining benefit from it.

59. Claim 12 of the '263 Patent recites (bold brackets added):

**[12.pre]** A powered building system comprising:

**[12.a]** an electric power distribution system configured to distribute electrical power to a plurality of receptacles;

**[12.b]** one or more load sources; and

**[12.c]** one or more battery systems associated with:

a respective receptacle of the plurality of receptacles, and

a respective load source of the one or more load sources,

**[12.d]** wherein the one or more battery systems include:

a first battery system that is disposed within a first load source of the one or more load sources, the first load source comprising a first power cord plugged into a first receptacle of the plurality of receptacles, **[12.e]** the first battery system comprising a first battery configured to obtain and store power from the first receptacle, **[12.f]** the first load source being configured to be fully powered by power stored by the first battery and configured to be fully powered by power obtained from the first receptacle and configured to be partially powered by both the first battery and power obtained from the first receptacle.

60. Impulse has directly infringed and is directly infringing, either literally or under the doctrine of equivalents, at least claim 12 of the '263 Patent. As set forth in the claim chart of **Exhibit D**, each recited element of claim 12 correlates with a disclosure set forth in Impulse's public materials, demonstrating that Impulse has put the system of claim 12 into service. Impulse

23

has committed infringing acts without authorization, consent, permission, or a license from Copper.

61.    Impulse has had actual knowledge of the '263 Patent prior to the filing of the instant Complaint, and at least as early as January 26, 2024, when it filed its Information Disclosure Statement for the Impulse '557 Application that cited Griffith, i.e., Copper '263 Patent's published application, as one of six prior art references.  Impulse also had actual knowledge because during that prosecution, the Examiner repeatedly rejected Impulse's claims as anticipated or rendered obvious by Griffith, and Impulse repeatedly attempted to overcome the Copper prior art through amendment and argument.

62.    Impulse has had actual knowledge of the '263 patent and specific intent to infringe, and has been and is now indirectly infringing the '263 Patent in violation of 35 U.S.C. § 271(b) at least by inducing its customers to purchase the Accused Products and by instructing, encouraging, and/or directing those customers on how to install or use the Accused Products in such a way as to put the claimed system of the '263 Patent into service, including claim 12.

63.    Impulse has been and is now contributorily infringing the '263 Patent in violation of 35 U.S.C. § 271(c).  Impulse has been offering to sell or selling the Impulse Cooktop and other Accused Products in the United States.  For example, the Impulse Cooktop constitutes a material part of the invention claimed in the '263 Patent, is especially made or especially adapted for use in infringing the '263 Patent, and is not a staple article or commodity of commerce suitable for substantial non-infringing use, as demonstrated by the evidence cited above and in **Exhibit D**.

64.    The Accused Products have no substantial use other than to practice one or more claims of the '263 Patent.  Once the Accused Product is installed or used by the end user as instructed, encouraged, configured, and designed by Impulse, one or more claims of the '263

24

Patent are being practiced. The Accused Products are not a staple article or commodity of commerce suitable for substantial non-infringing use. Rather, the Accused Products are configured and enabled to practice one or more claims of the '263 Patent once they are installed and used as intended.

65.    Impulse's infringement of the '263 Patent has been and continues to be willful. Impulse has acted with knowledge of the '263 Patent and without a reasonable basis for a good-faith belief that it would not be liable for infringement of the '263 Patent. Impulse has disregarded and continues to disregard its infringement, or disregard an objectively high likelihood that its actions constitute infringement of the '263 Patent. This risk was known or is so obvious that it should have been known to Impulse. Impulse's infringement of the '263 Patent has been and continues to be willful, entitling Copper to enhanced damages under 35 U.S.C. § 284.

66.    Impulse's acts of infringement have caused damage to Copper, and Copper is entitled to recover from Impulse the damages sustained by Impulse's wrongful acts in an amount subject to proof at trial.

67.    Impulse's acts of infringement have caused and, unless restrained and enjoined, will continue to cause irreparable injury and damage to Copper for which there is no adequate remedy at law.

68.    This case is exceptional, entitling Copper to an award of attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

## SECOND CLAIM FOR RELIEF

### (INFRINGEMENT OF THE '667 PATENT)

69.    Copper repeats and re-alleges the allegations set forth above as if repeated herein.

25

70.     The United States Patent and Trademark Office fully and legally issued the '667 Patent on January 7, 2025.

71.     Impulse has been and is now directly infringing one or more claims of the '667 Patent in violation of 35 U.S.C. § 271(a) at least when it tests or otherwise uses the Accused Products as a load source in an electric power distribution system, including when Impulse puts the system of at least claim 11 into service, controlling the system as a whole and obtaining benefit from it.

72.     Claim 11 of the '667 Patent recites (bold brackets added):

**[11.pre]** A powered building system comprising:

**[11.a]** an electric power distribution system configured to distribute electrical power to a plurality of receptacles;

**[11.b]** one or more load sources; and

**[11.c]** one or more battery systems associated with:

a respective receptacle of the plurality of receptacles, and

a respective load source of the one or more load sources,

**[11.d]** wherein the one or more battery systems include:

a first battery system associated with a first load source and a first receptacle of the plurality of receptacles, **[11.e]** the first battery system comprising a first battery configured to obtain and store power from the first receptacle of the plurality of receptacles, **[11.f]** the first load source configured to operate with power obtained from both the first battery and the first receptacle and also configured to operate with power obtained solely from the first receptacle.

73.     Impulse has directly infringed and is directly infringing, either literally or under the doctrine of equivalents, at least claim 11 of the '667 Patent.  As set forth in the claim chart of **Exhibit E**, each recited element of claim 11 correlates with a disclosure set forth in Impulse's public materials, demonstrating that Impulse has put the system of claim 11 into service.  Impulse

26

has committed infringing acts without authorization, consent, permission, or a license from Copper.

74.     On information and belief, Impulse had actual knowledge of Copper's '667 Patent by its issuance date of January 7, 2025. Impulse has had actual knowledge of the parent '263 Patent prior to the filing of the instant Complaint, and at least as early as January 26, 2024, when it filed its Information Disclosure Statement for the Impulse '557 Application that cited Griffith, i.e., Copper '263 Patent's published application, as one of six prior art references. Impulse also had actual knowledge because during that prosecution, the Examiner repeatedly rejected Impulse's claims as anticipated or rendered obvious by Griffith, and Impulse repeatedly attempted to overcome the Copper prior art through amendment and argument. By the time of the Final Rejection of the Impulse '557 Application on January 24, 2025, the '667 Patent (which is a continuation of the '263 Patent) had issued on January 7, 2025. In addition, Copper and Impulse are direct competitors of similar company sizes developing induction stovetop solutions at locations in the San Francisco Bay Area, attend the same industry conferences, and are aware of each other's products and technology. On information and belief, based on these available facts, Impulse had actual knowledge of Copper's '667 Patent by its issuance date of January 7, 2025.

75.     Impulse has had actual knowledge of the '667 patent and specific intent to infringe, and has been and is now indirectly infringing the '667 Patent in violation of 35 U.S.C. § 271(b) at least by inducing its customers to purchase the Accused Products and by instructing, encouraging, and/or directing those customers on how to install or use the Accused Products in such a way as to put the claimed system of the '667 Patent into service, including claim 11.

76.     Impulse has been and is now contributorily infringing the '667 Patent in violation of 35 U.S.C. § 271(c). Impulse has been offering to sell or selling the Impulse Cooktop and other

27

Accused Products in the United States.  For example, the Impulse Cooktop constitutes a material part of the invention claimed in the '667 Patent, is especially made or especially adapted for use in infringing the '667 Patent, and is not a staple article or commodity of commerce suitable for substantial non-infringing use, as demonstrated by the evidence cited above and in **Exhibit E**.

77.    The Accused Products have no substantial use other than to practice one or more claims of the '667 Patent.  Once the Accused Product is installed or used by the end user as instructed, encouraged, configured, and designed by Impulse, one or more claims of the '667 Patent are being practiced.  The Accused Products are not a staple article or commodity of commerce suitable for substantial non-infringing use.  Rather, the Accused Products are configured and enabled to practice one or more claims of the '667 Patent once they are installed and used as intended.

78.    Impulse's infringement of the '667 Patent has been and continues to be willful. Impulse has acted with knowledge of the '667 Patent and without a reasonable basis for a good-faith belief that it would not be liable for infringement of the '667 Patent.  Impulse has disregarded and continues to disregard its infringement, or has disregarded an objectively high likelihood that its actions constitute infringement of the '667 Patent.  This risk was known or is so obvious that it should have been known to Impulse.  Impulse's infringement of the '667 Patent has been and continues to be willful, entitling Copper to enhanced damages under 35 U.S.C. § 284.

79.    Impulse's acts of infringement have caused damage to Copper, and Copper is entitled to recover from Impulse the damages sustained by Impulse's wrongful acts in an amount subject to proof at trial.

80.     Impulse's acts of infringement have caused and, unless restrained and enjoined, will continue to cause irreparable injury and damage to Copper for which there is no adequate remedy at law.

81.     This case is exceptional, entitling Copper to an award of attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

**THIRD CLAIM FOR RELIEF**

**(INFRINGEMENT OF THE '435 PATENT)**

82.     Copper repeats and re-alleges the allegations set forth above as if repeated herein.

83.     The United States Patent and Trademark Office fully and legally issued the '435 Patent on January 14, 2025.

84.     Impulse has been and is now directly infringing one or more claims of the '435 Patent in violation of 35 U.S.C. § 271(a) at least when it tests or otherwise uses the Accused Products as a load source in an electric power distribution system, including when Impulse puts the system of at least claim 11 into service, controlling the system as a whole and obtaining benefit from it.

85.     Claim 11 of the '435 Patent recites (bold brackets added):

**[11.pre]** A powered building system comprising:

**[11.a]** an electric power distribution system configured to distribute electrical power to a plurality of receptacles;

**[11.b]** one or more load sources; and

**[11.c]** one or more battery systems associated with:

a respective receptacle of the plurality of receptacles, and

a respective load source of the one or more load sources,

**[11.d]** wherein the one or more battery systems include:

29

a first battery system associated with a first load source and with a first receptacle of the plurality of receptacles, **[11.e]** the first battery system comprising a first battery configured to obtain and store power from the first receptacle of the plurality of receptacles, **[11.f]** the first load source configured to operate with power obtained from both the first battery and the first receptacle.

86.     Impulse has directly infringed and is directly infringing, either literally or under the doctrine of equivalents, at least claim 11 of the '435 Patent.  As set forth in the claim chart of **Exhibit F**, each recited element of claim 11 correlates with a disclosure set forth in Impulse's public materials, demonstrating that Impulse has put the system of claim 11 into service.  Impulse has committed infringing acts without authorization, consent, permission, or a license from Copper.

87.     On information and belief, Impulse had actual knowledge of Copper's '435 Patent by its issuance date of January 14, 2025.  Impulse has had actual knowledge of the parent '263 Patent prior to the filing of the instant Complaint, and at least as early as January 26, 2024, when it filed its Information Disclosure Statement for the Impulse '557 Application that cited Griffith, i.e., Copper '263 Patent's published application, as one of six prior art references.  Impulse also had actual knowledge because during that prosecution, the Examiner repeatedly rejected Impulse's claims as anticipated or rendered obvious by Griffith, and Impulse repeatedly attempted to overcome the Copper prior art through amendment and argument.  By the time of the Final Rejection of the Impulse '557 Application on January 24, 2025, the '435 Patent (which is a continuation of the '263 Patent) had issued January 14, 2025.  In addition, Copper and Impulse are direct competitors of similar company sizes developing induction stovetop solutions at locations in the San Francisco Bay Area, attend the same industry conferences, and are aware of each other's products and technology.  On information and belief, based on these available facts, Impulse also had actual knowledge of Copper's '435 Patent by its issuance date of January 14, 2025.

88.     Impulse has had actual knowledge of the '435 patent and specific intent to infringe, and has been and is now indirectly infringing the '435 Patent in violation of 35 U.S.C. § 271(b) at least by inducing its customers to purchase the Accused Products and by instructing, encouraging, and/or directing those customers on how to install or use the Accused Products in such a way as to put the claimed system of the '435 Patent into service, including claim 11.

89.     Impulse has been and is now contributorily infringing the '435 Patent in violation of 35 U.S.C. § 271(c).  Impulse has been offering to sell or selling the Impulse Cooktop and other Accused Products in the United States.  For example, the Impulse Cooktop constitutes a material part of the invention claimed in the '435 Patent, is especially made or especially adapted for use in infringing the '435 Patent, and is not a staple article or commodity of commerce suitable for substantial non-infringing use, as demonstrated by the evidence cited above and in **Exhibit F**.

90.     The Accused Products have no substantial use other than to practice one or more claims of the '435 Patent.  Once the Accused Product is installed or used by the end user as instructed, encouraged, configured, and designed by Impulse, one or more claims of the '435 Patent are being practiced.  The Accused Products are not a staple article or commodity of commerce suitable for substantial non-infringing use.  Rather, the Accused Products are configured and enabled to practice one or more claims of the '435 Patent once they are installed and used as intended.

91.     Impulse's infringement of the '435 Patent has been and continues to be willful. Impulse has acted with knowledge of the '435 Patent and without a reasonable basis for a good-faith belief that it would not be liable for infringement of the '435 Patent.  Impulse has disregarded and continues to disregard its infringement, or has disregarded an objectively high likelihood that its actions constitute infringement of the '435 Patent.  This risk was known or is so obvious that it

31

should have been known to Impulse. Impulse's infringement of the '435 Patent has been and continues to be willful, entitling Copper to enhanced damages under 35 U.S.C. § 284.

92.    Impulse's acts of infringement have caused damage to Copper, and Copper is entitled to recover from Impulse the damages sustained by Impulse's wrongful acts in an amount subject to proof at trial.

93.    Impulse's acts of infringement have caused and, unless restrained and enjoined, will continue to cause irreparable injury and damage to Copper for which there is no adequate remedy at law.

94.    This case is exceptional, entitling Copper to an award of attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

## PRAYER FOR RELIEF

Based on the foregoing, Copper respectfully requests the following relief:

a)    A judgment that Impulse has infringed at least one claim of each of the Asserted Patents in violation of 35 U.S.C. § 271;

b)    A judgment awarding Copper damages adequate to compensate for Impulse's infringement of the Asserted Patents, in no event less than a reasonable royalty, including all pre-judgment and post-judgment interest;

c)    A judgment awarding Copper treble damages for any infringement found to be willful pursuant to 35 U.S.C. § 284;

d)    A declaration that this case is exceptional under 35 U.S.C. § 285 and a judgment awarding Copper its attorneys' fees, costs, and expenses incurred in this action;

e)    A judgment awarding Copper any and all other relief to which Copper may show itself to be entitled; and

f)      A judgment awarding Copper any other relief as the Court may deem just, equitable, and proper.

## JURY DEMAND

95.      Copper hereby demands a jury trial on all issues and claims so triable pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Andrew D. Gish
Joel C. Lin
David M. Lamb
GISH PLLC
41 Madison Avenue, Floor 31
New York, NY 10010
Tel: (212) 518-2000

Thomas J. Pardini
GISH PLLC
50 California Street, Suite 1500
San Francisco, CA 94111
Tel: (415) 630-7300

Dated: April 3, 2026
12861849 / 26015.00001

By: */s/ David E. Moore*
    David E. Moore (#3983)
    Bindu A. Palapura (#5370)
    Andrew M. Moshos (#6685)
    Peter T. Sabini (#7655)
    Hercules Plaza, 6th Floor
    1313 N. Market Street
    Wilmington, DE 19801
    Tel: (302) 984-6000
    dmoore@potteranderson.com
    bpalapura@potteranderson.com
    amoshos@potteranderson.com
    psabini@potteranderson.com

*Attorneys for Plaintiff Channing Street Copper Company*