**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| CHANNING STREET COPPER COMPANY, | ) )  ) |
| Plaintiff/Counterclaim-Defendant, | ) ) ) |
| v. | )   C.A. No. 1:26-cv-00369-JFM ) |
| IMPULSE LABS, INC, | )   **JURY TRIAL DEMANDED** ) |
| Defendant/Counterclaim-Plaintiff. | ) ) ) |

**DEFENDANT IMPULSE LABS' ANSWER, AFFIRMATIVE DEFENSES,
AND COUNTERCLAIMS**

Defendant Impulse Labs, Inc. ("Impulse"), by and though its undersigned attorneys, responds to the Complaint filed by Plaintiff Channing Street Copper Company ("Copper") on April 3, 2026 (D.I. 1). To the extent not specifically admitted herein, the allegations of the Complaint are denied.

**NATURE OF THE ACTION**

1.      Impulse admits that Copper purports to plead a cause of action for patent infringement. Impulse denies it has committed acts of infringement, and denies the remaining allegations of Paragraph 1 of the Complaint.

2.      Impulse lacks knowledge or information sufficient to form beliefs about the truth of the allegations in Paragraph 2 of the Complaint and therefore denies them.

3.      Denied.

**THE PARTIES**

4.      Paragraph 4 of the Complaint contains legal conclusions to which no response is required. To the extent a response is required, Impulse admits that, on information and belief,

Plaintiff Copper is a Delaware corporation with its principal place of business at 2827 Seventh Street, Berkeley, California 94710.

5.       Admitted.

## JURISDICTION AND VENUE

6.       Impulse admits that Copper purports to plead a cause of action for patent infringement. Impulse denies that it has committed any act of patent infringement, and denies any remaining allegations of Paragraph 6 of the Complaint.

7.       Impulse admits that this Court has subject matter jurisdiction over the Complaint pursuant to 28 U.S.C. §§ 1331 and 1338, provided that standing and other requirements are met, but denies that Copper's claims are valid or sustainable. Impulse denies any remaining allegations of Paragraph 7 of the Complaint.

8.       Impulse admits that it is a Delaware corporation and does not contest that this Court has personal jurisdiction over it solely for the purposes of this action. Copper's remaining allegations are legal conclusions to which no response is required. To the extent a response is required, Impulse denies the remaining allegations in Paragraph 8 of the Complaint, including that it has committed any acts of patent infringement in this or any other District.

9.       Impulse admits that it is a Delaware corporation and, solely for the purposes of this action, does not contest that venue is proper in this District.

## BACKGROUND

10.      Impulse admits that Copper purports to plead a cause of action for patent infringement.  Impulse denies that it has committed any act of patent infringement, and denies any remaining allegations of Paragraph 10 of the Complaint.

**Copper and Its Asserted Patents**

11.     Impulse lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 11 of the Complaint and therefore denies them.

12.     Impulse lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 12 of the Complaint and therefore denies them.

13.     Impulse lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 13 of the Complaint and therefore denies them.

### A.     The '263 Patent

14.     Impulse admits that Paragraph 14 of the Complaint states the title, named inventors, and issue date that appear on the face of the '263 Patent.  Impulse further admits Exhibit A to the Complaint is a true and correct copy of the '263 Patent.  Impulse denies the remaining allegations contained in Paragraph 14 of the Complaint.

15.     Impulse lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 15 of the Complaint and therefore denies them.

16.     Impulse states that the '263 Patent speaks for itself and denies any conclusions, characterizations, implications, insinuations, or speculations that Copper alleges follow from the language in Paragraph 16 of the Complaint

### B.     The '667 Patent

17.     Impulse admits that Paragraph 17 of the Complaint states the title, named inventors, and issue date that appear on the face of the '667 Patent.  Impulse further admits Exhibit B to the Complaint is a true and correct copy of the '667 Patent.  Impulse denies the remaining allegations contained in Paragraph 17 of the Complaint.

18.     Impulse lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 18 of the Complaint and therefore denies them.

19.     Impulse states that the '667 Patent speaks for itself and denies any conclusions, characterizations, implications, insinuations, or speculations that Copper alleges follow from the language in Paragraph 19 of the Complaint

### C.     The '435 Patent

20.     Impulse admits that Paragraph 20 of the Complaint states the title, named inventors, and issue date that appear on the face of the '435 Patent.  Impulse further admits Exhibit C to the Complaint is a true and correct copy of the '435 Patent.  Impulse denies the remaining allegations contained in Paragraph 20 of the Complaint.

21.     Impulse lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 21 of the Complaint and therefore denies them.

22.     Impulse states that the '435 Patent speaks for itself and denies any conclusions, characterizations, implications, insinuations, or speculations that Copper alleges follow from the language in Paragraph 22 of the Complaint.

### D.     The Asserted Patents

23.     Impulse states that the Asserted Patents speak for themselves and denies any conclusions, characterizations, implications, insinuations, or speculations that Copper alleges follow from the Asserted Patents.  Impulse denies the remaining allegations in Paragraph 23 of the Complaint.

24.     Impulse states that the Asserted Patents speak for themselves and denies any conclusions, characterizations, implications, insinuations, or speculations that Copper alleges follow from the Asserted Patents.  Impulse denies the remaining allegations in Paragraph 24 of the Complaint.

25.    Impulse states that the Asserted Patents speak for themselves and denies any conclusions, characterizations, implications, insinuations, or speculations that Copper alleges follow from the Asserted Patents.  Impulse denies the remaining allegations in Paragraph 25 of the Complaint.

26.    Impulse lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 26 of the Complaint and therefore denies them.

**Impulse, the Impulse Cooktop, and Impulse's Infringement**

27.    Denied.

28.    Impulse admits that, in or around January 2024, it launched pre-orders of its Impulse Cooktop.  Impulse further admits that it continues to develop and market the Impulse Cooktop.  Impulse further admits that, in or around August 2025, it began to ship, deliver, and install the Impulse Cooktop to customers.  Impulse denies any remaining allegations of Paragraph 28 of the Complaint.

29.    Impulse lacks sufficient information to respond to Paragraph 29 because Copper has not identified the date it viewed Impulse's website.  Regardless, Impulse states that its website speaks for itself and denies any conclusions, characterizations, implications, insinuations, or speculations that Copper alleges follow from Impulse's website.  Impulse denies the remaining allegations in Paragraph 29 of the Complaint.

30.    Impulse admits that the Accused Products are appliances but it is unclear what is meant by "receptacles" and Impulse therefore denies Copper's allegation.  Impulse otherwise lacks sufficient information to respond to Paragraph 30 because Copper has not identified the date it viewed Impulse's website.  Regardless, Impulse states that its website speaks for itself and denies any conclusions, characterizations, implications, insinuations, or speculations that Copper

alleges follow from Impulse's website.  Impulse further objects to Copper's allegations as vague and therefore denies the remaining allegations in Paragraph 30 of the Complaint.

31.    Impulse lacks sufficient information to respond to Paragraph 31 because Copper has not identified the date it viewed Impulse's website.  Regardless, Impulse states that its website speaks for itself and denies any conclusions, characterizations, implications, insinuations, or speculations that Copper alleges follow from Impulse's website.  Impulse further objects to Copper's allegations as vague and therefore denies the remaining allegations in Paragraph 31 of the Complaint.

32.    Impulse lacks sufficient information to respond to Paragraph 32 because Copper has not identified the date it viewed Impulse's website.  Regardless, Impulse states that its website speaks for itself and denies any conclusions, characterizations, implications, insinuations, or speculations that Copper alleges follow from Impulse's website.  Impulse further objects to Copper's allegations as vague and therefore denies the remaining allegations in Paragraph 32 of the Complaint.

33.    Impulse lacks sufficient information to respond to Paragraph 33 because Copper has not identified the date it viewed Impulse's website.  Regardless, Impulse states that its website speaks for itself and denies any conclusions, characterizations, implications, insinuations, or speculations that Copper alleges follow from Impulse's website.  Impulse further objects to Copper's allegations as vague and therefore denies the remaining allegations in Paragraph 33 of the Complaint.

34.    Impulse lacks sufficient information to respond to Paragraph 34 because Copper has not identified the date it viewed Impulse's website.  It is unclear what is meant by "receptacles" and Impulse therefore denies Copper's allegation.  Regardless, Impulse states that

its website speaks for itself and denies any conclusions, characterizations, implications, insinuations, or speculations that Copper alleges follow from Impulse's website.  Impulse further objects to Copper's allegations as vague and therefore denies the remaining allegations in Paragraph 34 of the Complaint.

35.     Impulse lacks sufficient information to respond to Paragraph 35 because Copper has not identified the date it viewed Impulse's website.  Regardless, Impulse states that its website speaks for itself and denies any conclusions, characterizations, implications, insinuations, or speculations that Copper alleges follow from Impulse's website.  Impulse further objects to Copper's allegations as vague and therefore denies the remaining allegations in Paragraph 35 of the Complaint.

36.     Impulse lacks sufficient information to respond to Paragraph 36 because Copper has not identified the date it viewed Impulse's website.  Regardless, Impulse states that its website speaks for itself and denies any conclusions, characterizations, implications, insinuations, or speculations that Copper alleges follow from Impulse's website.  Impulse further objects to Copper's allegations as vague and therefore denies the remaining allegations in Paragraph 36 of the Complaint.

37.     Impulse lacks sufficient information to respond to Paragraph 37 because Copper has not identified the date it viewed Impulse's website.  Regardless, Impulse states that its website speaks for itself and denies any conclusions, characterizations, implications, insinuations, or speculations that Copper alleges follow from Impulse's website.  Impulse further objects to Copper's allegations as vague and therefore denies the remaining allegations in Paragraph 37 of the Complaint.

38. Impulse lacks sufficient information to respond to Paragraph 38 because Copper has not identified a specific reference it contends is the "Troubleshooting guide" or the "Impulse Cooktop User Interface guide," and denies the allegations in Paragraph 38 of the Complaint on that basis.

39. Impulse objects Paragraph 39 to the extent the quoted language is taken out of context. Regardless, Impulse states that the referenced video speaks for itself and denies any conclusions, characterizations, implications, insinuations, or speculations that Copper alleges follow from the video. Impulse further objects to Copper's allegations as vague and therefore denies the remaining allegations in Paragraph 39 of the Complaint.

40. Denied.

### Impulse's Actual Knowledge of Copper's Asserted Patents

41. Impulse admits it submitted an Information Disclosure Statement ("IDS") during prosecution of Impulse's U.S. Patent Application No. 18/424,557 ("the Impulse '557 Application"). The IDS speaks for itself and Impulse denies any conclusions, characterizations, implications, insinuations, or speculations that Copper alleges follow from the admitted facts. Impulse denies the remaining allegations in Paragraph 41 of the Complaint.

42. Impulse objects to Paragraph 42 to the extent the quoted language is taken out of context. Regardless, Impulse states that the Examiner's September 16, 2024 decision speaks for itself and denies any conclusions, characterizations, implications, insinuations, or speculations that Copper alleges follow the Examiner's September 16, 2024 decision. Impulse further objects to Copper's allegations as vague and therefore denies the remaining allegations in Paragraph 42 of the Complaint.

43. Impulse admits that, on December 16, 2024, Impulse submitted Applicant Arguments/Remarks in connection with the '557 Application. Impulse states that its Applicant

Arguments/Remarks speaks for itself and denies any conclusions, characterizations, implications, insinuations, or speculations that Copper alleges follow from the admitted facts. Impulse denies the remaining allegations in Paragraph 43 of the Complaint.

44. Impulse states that the Examiner's January 24, 2025 rejection and Impulse's July 23, 2025 amendment speak for themselves and denies any conclusions, characterizations, implications, insinuations, or speculations that Copper alleges follow from therefrom. Impulse denies the remaining allegations in Paragraph 44 of the Complaint.

45. Impulse states that the Examiner's August 6, 2025 rejection and Impulse's January 6, 2026 amendment speak for themselves and denies any conclusions, characterizations, implications, insinuations, or speculations that Copper alleges follow therefrom. Impulse denies the remaining allegations in Paragraph 45 of the Complaint.

46. Impulse states that the '817 Application, the Examiner's September 25, 2025 rejection, and Impulse's January 6, 2026 amendment speak for themselves and denies any conclusions, characterizations, implications, insinuations, or speculations that Copper alleges follow therefrom. Impulse denies the remaining allegations in Paragraph 46 of the Complaint.

47. Impulse states that the Asserted Patents speak for themselves and denies any conclusions, characterizations, implications, insinuations, or speculations that Copper alleges follow from those patents. Impulse denies the remaining allegations in Paragraph 47 of the Complaint.

48. Denied.

### Impulse's Indirect Infringement

49. Denied.

50. Denied.

51. Denied.

9

52.    Denied.

53.    Denied.

54.    Impulse states that its User Manual speaks for itself and denies any conclusions, characterizations, implications, insinuations, or speculations that Copper alleges follow from Impulse's User Manual.  Impulse denies the remaining allegations in Paragraph 54 of the Complaint.

55.    Denied.

### FIRST CLAIM FOR RELIEF

### (INFRINGEMENT OF THE '263 PATENT)

56.    Impulse refers to and incorporates its responses in Paragraphs 1-55 above.

57.    Impulse admits that the '263 Patent states it was issued on January 9, 2024. Impulse denies the remaining allegations contained in Paragraph 57 of the Complaint.

58.    Denied.

59.    Impulse states that the '263 Patent speaks for itself and denies any conclusions, characterizations, implications, insinuations, or speculations that Copper alleges follow from the language in Paragraph 59 of the Complaint.

60.    Denied.

61.    Impulse admits the '263 Patent was cited in the Information Disclosure Statement for the Impulse '557 Application.  Impulse denies the remaining allegations in Paragraph 61 of the Complaint.

62.    Denied.

63.    Denied.

64.    Denied.

65.    Denied.

10

66.     Denied.

67.     Denied.

68.     Denied.

## SECOND CLAIM FOR RELIEF

## (INFRINGEMENT OF THE '667 PATENT)

69.     Impulse refers to and incorporates its responses in Paragraphs 1-68 above.

70.     Impulse admits that the '667 Patent states that it issued on January 7, 2025. Impulse denies the remaining allegations contained in Paragraph 70 of the Complaint.

71.     Denied.

72.     Impulse states that the '667 Patent speaks for itself and denies any conclusions, characterizations, implications, insinuations, or speculations that Copper alleges follow from the language in Paragraph 72 of the Complaint.

73.     Denied.

74.     Denied.

75.     Denied.

76.     Denied.

77.     Denied.

78.     Denied.

79.     Denied.

80.     Denied.

81.     Denied.

## THIRD CLAIM FOR RELIEF

## (INFRINGEMENT OF THE '435 PATENT)

82.     Impulse refers to and incorporates its responses in Paragraphs 1-82 above.

11

83. Impulse admits that the '435 Patent states that it issued on January 14, 2025. Impulse denies the remaining allegations contained in Paragraph 83 of the Complaint.

84. Denied.

85. Impulse states that the '435 Patent speaks for itself and denies any conclusions, characterizations, implications, insinuations, or speculations that Copper alleges follow from the language in Paragraph 85 of the Complaint.

86. Denied.

87. Denied.

88. Denied.

89. Denied.

90. Denied.

91. Denied.

92. Denied.

93. Denied.

93. Denied.

## PRAYER FOR RELIEF

94. Impulse denies that Copper is entitled to any relief from Impulse and denies all the allegations contained in Paragraphs A-F of Copper's Prayer for Relief.

## JURY DEMAND

95. Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure and D. Del. LR 38.1, Impulse hereby demands a trial by jury for all issues so triable.

## DEFENSES

Impulse's Defenses are listed below. Impulse reserves the right to amend its Answer to add additional Defenses, including allegations of inequitable conduct, consistent with the facts discovered in this case.

### FIRST DEFENSE

Copper's Complaint fails to state a claim upon which relief can be granted.

### SECOND DEFENSE

Impulse has not infringed and does not infringe, under any theory of infringement (including directly (whether individually or jointly) or indirectly (whether contributorily or by inducement)), any valid, enforceable claim of U.S. Patent No. 11,870,263 ("the '263 Patent"), U.S. Patent No. 12,191,667 ("the '667 Patent"), and U.S. Patent No. 12,199,435 ("the '435 Patent") (collectively, "the Asserted Patents").

### THIRD DEFENSE

Each asserted claim of each of the Asserted Patents is invalid for failure to comply with one or more of the requirements of the United States Code, Title 35, including without limitation, 35 U.S.C. §§ 101, 102, 103, and 112, and the rules, regulations, and laws pertaining thereto.

### FOURTH DEFENSE

Impulse has not willfully infringed any claim of the Asserted Patents, and Copper is not entitled to enhanced damages under 35 U.S.C. § 284.

### FIFTH DEFENSE

Copper has failed to state facts and/or a legal basis sufficient to permit the Court to grant equitable or injunctive relief against Impulse.

### SIXTH DEFENSE

Copper's claims for damage are statutorily limited or barred by 35 U.S.C. § 286.

13

## SEVENTH DEFENSE

Copper's request for costs and/or attorneys' fees is barred, in whole or in part, by 35 U.S.C. §§ 285, 286, and/or 288.  Copper cannot prove that this case is an exceptional case justifying the award of attorneys' fees under 35 U.S.C. § 285.

## RESERVATION OF DEFENSES

Discovery in this action has not yet commenced and Impulse continues to investigate the allegations set forth in the Complaint.  Impulse hereby provides explicit notice to Copper that it intends to rely upon such other defenses as may become available by law or in equity, or pursuant to statute, as discovery proceeds in this action, and hereby reserves the right to assert such additional defenses.

## COUNTERCLAIMS

Defendant/Counterclaim-Plaintiff Impulse Labs, Inc. ("Impulse"), by and through its undersigned counsel, hereby asserts the following Counterclaims against Plaintiff/Counterclaim-Defendant Channing Street Copper Company ("Copper"):

### OVERVIEW OF THE ACTION

1.      Impulse was founded in 2021 by Sam D'Amico. Mr. D'Amico graduated from Stanford University with a Master of Science in Electrical Engineering in 2013 and worked for nearly a decade at Facebook and Google prior to founding Impulse.

2.      Copper has had to make false and misleading claims in marketing its "Charlie" product in order to compete in the marketplace.

3.      Copper has attempted to deceive and has deceived consumers by falsely and misleadingly advertising that Charlie is eligible for tax credits for which it is not eligible. Moreover, Copper also has attempted to deceive and has deceived consumers by falsely and misleadingly advertising the applicability to Charlie of relevant industry standards.

4.      Impulse brings these counterclaims to account for Copper's unfair and deceptive commercial misinformation campaign.

### THE PARTIES

5.      Impulse Labs, Inc. is a Delaware corporation with its principal place of business at 101 15th Street, San Francisco, California 94103.

6.      Channing Street Copper Company avers that it is a Delaware corporation with its principal place of business at 2827 Seventh Street, Berkeley, California 94710. D.I. 1 ¶ 4.

15

**JURISDICTION AND VENUE**

7.      This Court has subject matter jurisdiction over Impulse's counterclaims pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367 because the counterclaims arise under the laws of the United States, including 15 U.S.C. § 1125(a), or form part of the same case or controversy.

8.      This Court has personal jurisdiction over Copper because Copper avers it is incorporated in Delaware, initiated this action in the District of Delaware, and has availed itself of the laws and courts of this jurisdiction.

9.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Impulse resides in this District, Copper avers it resides in this District, and a substantial part of the events giving rise to these counterclaims have occurred and continue to occur in this District and elsewhere.

**COUNTERCLAIM ONE**
**(False Advertising Under the Lanham Act)**
**(15 U.S.C. § 1125(a))**

**A.      Copper's False and Misleading Advertising Related to UL Standards**

(a)      <u>Background of UL Standards</u>

10.      UL stands for Underwriters Laboratories, which was the original name of an organization, founded in 1894, that seeks to advance innovation through safety science research, standards development, and product safety testing.

11.      UL is accredited by American National Standards Institute ("ANSI") as an audited designator of standards.[1]

---

[1] https://webstore.ansi.org/sdo/ul?srsltid=AfmBOoqCPzxnosFr3nnIvDhl_Xn5bChH405GO26q3PhtowKT_H98nXy6; https://www.ul.com/news/ul-recognizes-100-years-ansi-standards-and-leadership. ANSI is a private, non-profit organization that administers and coordinates the U.S.

12.     UL standards documents are developed through a consensus-based process involving experts from the stakeholder community.

13.     A UL standard is a published set of best practices for testing and evaluating the safety, security, and sustainability of a product or system, developed and voted on by experts across industries and interests.

14.     When a product conforms to a UL standard, the standard ensures quality and consistency in its materials, construction, manufacture, testing, installation, performance, and use.

15.     The process for certification to a UL standard requires the device be submitted to a Nationally Recognized Testing Laboratory for testing.

16.     Additionally, as part of the process for certification to a UL standard, the factories where the device is manufactured must be inspected by the certifying body.  Factory inspections must be completed multiple times per year for as long as the device is to be marketed as listed and labeled as certified to the UL standard.

17.     For Impulse, it took approximately two years and in excess of a million dollars to become certified to UL 858 and UL 1973.

(b)     UL 858, the Standard for Household Electric Ranges

18.     UL 858 is the Standard for Safety for Household Electric Ranges.  The Sixteenth Edition is dated November 7, 2014, and includes revisions through June 4, 2025.

19.     The UL 858 standard sets various construction, testing, and safety requirements for household electric ranges.

---

standards and conformity assessment system – it does not develop the standards themselves. https://www.ansi.org/about/introduction

17

20. The UL 858 standard ensures electric ranges align with industry-specific safety benchmarks, providing manufacturers and engineers with essential data to enhance the reliability and safety of their appliances.

21. UL 858 and its prerequisite standards perform electrical safety tests and electronic emissions tests for electric cooking appliances.

22. UL 858 also requires a surface temperature test for the exterior of ranges or ovens, as well as handles and control knobs during operation.

23. UL 858 also limits electric range top temperatures to help prevent fires caused by overheating foods and liquids.

        (c)      UL 1973, Batteries for Use in Stationary Motive Auxiliary Power Applications

24. UL 1973 is the Standard for Safety for Batteries for Use in Stationary Motive Auxiliary Power Applications. The Third Edition is dated February 25, 2022.

25. The UL 1973 standard sets various construction, testing, and safety requirements for battery systems for use as energy storage for stationary applications.

26. The UL 1973 standard not only evaluates the battery system's ability to safely withstand simulated abuse conditions but it also evaluates the battery system based upon the manufacturer's specified parameters.

        (d)      UL 9540A, Test Method for Battery Energy Storage Systems

27. UL 9540A is the Test Method for Battery Energy Storage Systems.

28. The UL 9540A test is designed to meet stringent fire safety and building code requirements for battery energy storage systems.

29. UL 9540A is a test method used in coordination with UL 9540 certification safety standard.

30.     Unlike UL 858 and UL 1973, UL 9540A is not a certification standard. Accordingly it is not possible to be "certified" or "listed and labeled" as compliant with UL 9540A.

(e)     Impact of UL Standards

31.     Copper's Charlie, as an electric range with a battery, is subject to the UL 858 and UL 1973 standards.

32.     Many states and municipalities have issued laws that require products, including battery-powered electric cooking appliances, to comply with UL standards.

33.     All states, and some municipalities like New York City, have adopted the NFPA 70 National Electrical Code ("NEC").  Article 422, section 2 provides that:  "All appliances supplied by 50 volts or higher shall be listed."

34.     The NEC puts all UL standards references into an Annex.  That Annex expressly calls out UL 858.

35.     Although some states and municipalities have amended the NEC, none have amended the requirement in Article 422, section 2.

36.     Additionally, the International Mechanical Code ("IMC") is a consensus national model code concentrating on the installation and safety of heating, ventilation, and air conditioning systems.

37.     Section 917 of the IMC applies to cooking appliances.  Subsection 1 provides, in relevant part, that "Household electric ranges shall be listed and labeled in accordance with UL 858."

38.     The IMC is adopted in 47 states and several municipalities, including New York City.

39.    For example, New York City's Mechanical Code ("MC") references several UL

standards, including UL 858.  Specifically, MC § 917.1, which relates to "cooking appliances,"

provides:

> **917.1 Cooking appliances.** Cooking appliances that are designed for permanent installation, including ranges, ovens, stoves, broilers, grills, fryers and griddles shall be listed, labeled and installed in accordance with the manufacturer's instructions. Oil-fired cooking appliances are prohibited. Commercial electric cooking appliances shall be listed and labeled in accordance with UL 197. ***Household electric ranges shall be listed and labeled in accordance with UL 858.*** Microwave cooking appliances shall be listed and labeled in accordance with UL 923. Oil-burning stoves shall be listed and labeled in accordance with UL 896. Solid-fuel-fired ovens shall be listed and labeled in accordance with UL 2162.[2]

40.    Identically, section 917.1 of the North Carolina Mechanical Code, which has the

full weight of state law, *see* N.C. G.S. § 143-138, provides:

> **917.1 Cooking appliances.** Cooking appliances that are designed for permanent installation, including ranges, ovens, stoves, broilers, grills, fryers, griddles and barbecues, shall be listed, labeled and installed in accordance with the manufacturer's instructions. Commercial electric cooking appliances shall be listed and labeled in accordance with UL 197. ***Household electric ranges shall be listed and labeled in accordance with UL 858.*** Microwave cooking appliances shall be listed and labeled in accordance with UL 923. Oil-burning stoves shall be listed and labeled in accordance with UL 896. Solid-fuel-fired ovens shall be listed and labeled in accordance with UL 2162.[3]

41.    Similarly, Ohio Admin. Code 4101:8-19-01 – "Special appliances, equipment and

systems" requires compliance with UL standards:

> **1901.2 Cooking appliances.** Cooking appliances shall be listed and labeled for household use and shall be installed in accordance with the manufacturer's instructions. The installation shall not interfere with combustion air or access for operation and servicing. ***Electric cooking appliances shall comply with UL 1026***

---

[2] https://www.nyc.gov/assets/buildings/apps/pdf_viewer/viewer.html?file=2022MC_Chapter9_SpecificAppliancesWB.pdf&section=conscode_2022 (emphasis added).

[3] https://up.codes/viewer/north_carolina/imc-2021/chapter/9/specific-appliances-fireplaces-and-solid-fuel-burning-equipment#917 (emphasis added).

*or UL 858.* Solid-fuel-fired fireplace stoves shall comply with UL 737. Microwave ovens shall comply with UL 923.[4]

42.    And Section 919.2 of the California Mechanical Code – "Electric Household Cooking Appliances" – likewise requires compliance with UL 858:

> **919.2 Electric Household Cooking Appliances**. Electric household cooking appliances designed for permanent installations shall be installed in accordance with the manufacturer's installation instructions. ***Household electric ranges shall comply with UL 858***.[5]

43.    Cooking appliances that are not certified to UL 858 face obstacles to secure insurance, financing, or regulatory approval.

### (f)    Copper's False and Misleading Statements Regarding UL 858's Applicability to Charlie

44.    Copper has made false and misleading statements in interstate commerce regarding UL 858's applicability to its a battery-integrated induction range called "Charlie".

45.    Copper advertises on its website as of the date of this filing that "UL does not yet certify battery-integrated appliances to UL 858."[6]

46.    Copper's website constitutes commercial advertising and promotion within the meaning of the Lanham Act.

47.    As another example, Charlie's CEO and founder, Sam Calisch, also told the New York Times Wirecutter division that "the Charlie was not eligible for UL electric-range

---

[4]    https://www.law.cornell.edu/regulations/ohio/Ohio-Admin-Code-4101-8-19-01 (emphasis added).

[5]    https://epubs.iapmo.org/2025/CMC/index.html (emphasis added).

[6]    https://copperhome.com/pages/faq.

certification." As of the date of this filing, the New York Time Wirecutter review of Charlie is cited on Copper's website.[7]

48. These statements are false and misleading. Nationally Recognized Testing Laboratories, such as MET Laboratories, which certified the Impulse Cooktop to UL 858, do in fact test and certify battery-integrated appliances under UL 858.

49. On information and belief, Copper is aware these statements are false and misleading because it is aware that the Impulse Cooktop is certified under UL 858.

50. Copper's misrepresentations actually deceive, or have a tendency to deceive, consumers because these statements create the misimpression that it is not possible to certify a battery-integrated appliance to UL 858.

51. Copper's misrepresentations actually deceive, or have a tendency to deceive, consumers into believing the UL 858 certification is not available to be considered when deciding on choosing induction cooking appliances such as Charlie. Specifically, consumers may reasonably conclude from Copper's misrepresentations that UL certification is not available thereby misleading consumers into not considering whether a cooking appliance is certified in making buying choices. It further misleads consumers into believing that such certification is not required despite the sale of such cooking appliance into jurisdictions where compliance with UL standards is required by law.

52. Copper's misrepresentations are material and are likely to affect consumer purchasing decisions because, on information and belief, consumers prefer to purchase cooking appliances that are certified by UL.

---

[7] https://copperhome.com/pages/faq.

53.     Copper's misrepresentations are material and are likely to affect consumer purchasing decisions because representations about a product's compliance with UL standards and applicability of those standards in certain jurisdictions directly affect consumer purchasing decisions, including consumers who might otherwise purchase the UL certified Impulse Cooktop.

54.     If Copper did not misrepresent that Charlie need not be certified to UL 858, consumers would be less likely to purchase Charlie.

55.     Copper's false and misleading advertising is disseminated to actual and prospective purchasers of Charlie through Copper's publicly accessible website for the purpose of influencing consumer purchasing decisions.

56.     Copper's false and misleading advertising about UL 858 certification harms Impulse because Copper and Impulse both develop, manufacture, and sell induction cooking products in the United States.  By falsely and misleadingly representing that Charlie cannot be certified as compliant with UL 858 and that it need not comply with UL 858, customers are misled into purchasing Charlie when they could purchase an Impulse Cooktop which is certified to UL 858.

(g)     Copper's False and Misleading Statements Regarding Charlie's Compliance With UL 858

57.     Copper has made false and misleading statements in interstate commerce regarding Charlie fulfilling the requirements necessary for UL 858 certification.

58.     For example, Copper advertises on its website as of the date of this filing that "Charlie has passed the applicable protection and performance safety tests of the existing UL 858 standard with a qualified product safety testing lab in UL's Data Acceptance Program."[8]

---

[8]   https://copperhome.com/pages/faq.

59. Charlie is not certified as compliant with UL 858. This advertising is false and misleading because it suggests that in the absence of an applicable UL certification, the safety tests that Copper allegedly has completed are equivalent to UL certification.

60. Copper's misrepresentations actually deceive, or have a tendency to deceive, consumers because Copper's advertising creates the misimpression that the safety tests that Copper has allegedly completed are equivalent to UL certification which it falsely maintains is not available for its product.

61. Copper's misrepresentations are material and are likely to affect consumer purchasing decisions because, on information and belief, consumers prefer to purchase cooking appliances that are certified to UL 858 over cooking appliances that are not certified to UL 858.

62. If Copper did not misrepresent Charlie as having passed the applicable protection and performance safety tests of UL 858, consumers would be less likely to purchase Charlie.

63. Copper's false and misleading advertising is disseminated to actual and prospective purchasers of Charlie through Copper's publicly accessible website for the purpose of influencing consumer purchasing decisions.

64. Copper's false and misleading advertising about UL 858 certification harms Impulse because Copper and Impulse both develop, manufacture, and sell induction cooking products in the United States. By misleadingly representing that Charlie has passed the applicable protection and performance safety tests of UL 858, customers may be deceived into purchasing Charlie when they could purchase an Impulse Cooktop which actually is certified to UL 858.

(h)    Copper's False and Misleading Statements Regarding UL 1973

65. Copper has made false and misleading statements in interstate commerce regarding Charlie being UL 1973 certified.

24

66. For example, as depicted below, Copper advertises in its Charlie Customer Care Manual, which is available on Charlie's website as of the date of this filing, that Charlie's battery is certified to UL 1973.

BATTERY SPECIFICATIONS
- Type: Rechargeable Lithium Ion Battery
- Subtype: Lithium Iron Phosphate
- Rating: 208VDC, 25.8Ah (5366.4Wh)
- Operating temperature: 5C° to 50C°
- Storage temperature: 5C° to 50C°
- Internal cells: LiFePO4, 26700 size
- Cell configuration: 65S6P
- Weight: 59.5 kg
- Size: 586 × 550 × 132 mm
- Model: ZE23182
- Certification: UL1973, UN38.3, UL9540A

67. This advertising is false and misleading because it suggests that Charlie's battery is certified to UL 1973 when it is not.

68. Copper holds out the Charlie battery as certified to UL 1973 even though it has not satisfied two crucial conditions required for the Charlie battery to be listed and labeled as a UL 1973 Recognized Component.

69. First, where a battery that is certified as compliant with UL 1973 is installed in a final assembly, the final assembly must also be certified as compliant with UL standards.

70. This is confirmed by the UL Confirmation Letter for Charlie's battery, which states Copper's products "are incomplete in certain constructional features or restricted in performance capabilities and are intended for use as components of complete equipment submitted for investigation rather than for direct separate installation in the field. The final acceptance of the component is dependent upon its installation and use in complete equipment submitted to UL LLC."

71.   Copper does not satisfy this condition because, as discussed above, Charlie is not certified as compliant with UL 858.

72.   Second, a battery that is certified as a Recognized Component to UL 1973 must be labeled with the UL recognized component mark ("UR label") to be recognized as compliant.

73.   Copper's Charlie does not satisfy this condition because Copper does not affix the UR label onto Charlie's battery.

74.   This also is confirmed by the UL Confirmation Letter for Charlie's battery, which states Copper's products "are not covered under UL Solutions' Surveillance Program unless they bear the authorized UL Mark."  The UL Confirmation Letter further confirms that "only those products bearing the appropriate authorized UL Mark or UL Recognized Component Mark, the authorized company name, tradename, trademark and product designation shall be considered as being covered by the UL Solutions' Listing, Classification, or Recognition Service."

75.   On information and belief, Copper now has stopped affixing the UL label on its batteries installed in Charlie systems.

76.   Copper's misrepresentations actually deceive, or have a tendency to deceive, consumers because Copper's advertising created the misimpression that Charlie is UL 1973 certified despite the fact that it does not meet the conditions necessary for certification.

77.   Copper's misrepresentations are material and are likely to affect consumer purchasing decisions because, on information and belief, consumers prefer to purchase devices that are certified to UL 1973 over devices with integrated batteries that are not certified to UL 1973.

78.   If Copper did not misrepresent Charlie as certified to UL 1973, consumers would be less likely to purchase Charlie.

26

79.    Copper's false and misleading advertising is disseminated to actual and prospective purchasers of Charlie through Copper's publicly accessible website for the purpose of influencing consumer purchasing decisions.

80.    Copper's false and misleading advertising about UL 1973 certification harms Impulse because Copper and Impulse both develop, manufacture, and sell induction cooking products in the United States.  By falsely and misleadingly representing that Charlie is certified to UL 1973, customers may be and are deceived into purchasing Charlie when they could purchase an Impulse Cooktop which is certified to UL 1973.

(i)    Copper's False and Misleading Statements Regarding UL 9540A

81.    Copper has made false and misleading statements in interstate commerce regarding Charlie being UL 9540A certified.

82.    For example, as depicted below, Copper advertises in its Charlie Customer Care Manual, which is available on Copper's website as of the date of this filing, that Charlie's battery is certified to UL 9540A.

BATTERY SPECIFICATIONS
- Type: Rechargeable Lithium Ion Battery
- Subtype: Lithium Iron Phosphate
- Rating: 208VDC, 25.8Ah (5366.4Wh)
- Operating temperature: 5C° to 50C°
- Storage temperature: 5C° to 50C°
- Internal cells: LiFePO4, 26700 size
- Cell configuration: 65S6P
- Weight: 59.5 kg
- Size: 586 × 550 × 132 mm
- Model: ZE23182
- Certification: UL1973, UN38.3, UL9540A

83.    Copper's CEO repeated this false assertion to the New York Times Wirecutter division.

84.    This advertising is false and misleading because it suggests that Charlie is certified to UL 9540A when it is not.

85.    As discussed above, UL 9540A is a testing standard, not a certification standard.

86.    Copper's misrepresentations actually deceive, or have a tendency to deceive, consumers because Copper's advertising creates the misimpression that Charlie is certified to UL 9540A certified despite the fact that it is not possible for a battery to be certified to UL 9540A.

87.    Copper's misrepresentations are material and are likely to affect consumer purchasing decisions because, on information and belief, consumers prefer to purchase cooking appliances with integrated batteries that are certified to UL standards over cooking appliances with integrated batteries that are not certified to UL standards.

88.    If Copper did not misrepresent Charlie as certified to UL 9540A, consumers would be less likely to purchase Charlie.

89.    Copper's false and misleading advertising is disseminated to actual and prospective purchasers of Charlie through Copper's publicly accessible Charlie Customer Care Manual for the purpose of influencing consumer purchasing decisions.

90.    Copper's false and misleading advertising about UL 9540A certification harms Impulse because Copper and Impulse both develop, manufacture, and sell induction cooking products in the United States.  By falsely and misleadingly representing that Charlie is certified to UL 9540A, customers may be deceived into purchasing Charlie based on Copper's representations of UL 9540A certification when they could purchase an Impulse Cooktop, which Impulse does not falsely advertise as being certified to UL 9540A.

91.

28

**B.** **Copper's False and Misleading Advertising Related to Section 48E Tax Credit Eligibility**

(a) <u>Copper's Charlie Product Is Largely Manufactured in China</u>

92. On information and belief, Charlie's battery, power supply, appliance housing, and several other key components are sourced from suppliers in China.

93. Specifically, Copper's seed deck discloses that it tested Charlie with three battery suppliers in China.

94. In addition, on information and belief, Charlie's chassis is sourced, at least in part, from China.

95. Moreover, a report from ImportGenius, a market intelligence platform that provides global trade data, shows that Copper is importing the range enclosure for Charlie from Guangdong Hyxion Smart Kitchen Co., a manufacturer in China.

96. On information and belief, Chinese companies manufacture the battery cells and battery pack for Charlie's battery system.

97. Moreover, as shown in the following screenshot, Charlie's battery is affixed with a label that says "Made in China" and "Rechargeable Li-ion Battery."

29



(b)     Section 48E and Pre-2025 Requirements

98.     Section 48E of the Internal Revenue Code, as enacted by the Inflation Reduction Act of 2022 (Pub. L. 117-169, effective August 16, 2022), established the Clean Electricity Investment Credit—a commercial investment tax credit available to taxpayers who place qualifying clean electricity generation facilities or energy storage technology in service.

99.     Initially, Section 48E provided a base credit rate of 6% and an alternative credit rate of 30% for energy storage technology if certain conditions were satisfied.  26 U.S.C. § 48E(a)(2)(B) (2022).

100.    On top of the base or alternative rate, Section 48E provided two bonus credit adders: (1) an energy community adder of 2 percentage points (for property at the base 6% rate) or 10 percentage points (for property at the alternative 30% rate) if the investment was placed in service within a designated "energy community"; and (2) a domestic content bonus, discussed below.  26 U.S.C. § 48E(a)(3) (2022).

101.    Section 48E(a)(3)(B) provided:  "[d]omestic content.--Rules similar to the rules of section 48(a)(12) shall apply."   This section incorporated the domestic content bonus credit framework developed under Section 48(a)(12) of the Internal Revenue Code.

102.    To qualify for the domestic content bonus, the taxpayer must demonstrate that the applicable percentage of the total costs of all manufactured products comprising the property are attributable to manufactured products mined, produced, or manufactured in the United States.  26 U.S.C. 48(a)(12); *see also* 26 U.S.C. § 45(b)(9)(C) (providing an applicable percentage of 40%).

103.    If at least 40% of the total cost of manufactured products comprising the qualifying energy storage technology was attributable to U.S.-manufactured products, the taxpayer was entitled to a domestic content bonus of 10 percentage points on top of the applicable base or alternative credit rate.

(c)    <u>The One Big Beautiful Bill Act and Its Impact on Section 48E Eligibility</u>

104.    On July 4, 2025, President Trump signed into law Pub. L. 119-21, commonly known as the "One Big Beautiful Bill Act" (the "Act").

105.    The Act amended Section 48E in several material respects, including by adding new restrictions on qualification for tax credits.

106.    As amended by the Act, Section 48E(c)(3), the material assistance bar, provides that the term "energy storage technology" "shall not include any property the construction of which begins after December 31, 2025, if the construction of such property includes any material assistance from a prohibited foreign entity."  26 U.S.C. § 48E(c)(3).

107.    The term "prohibited foreign entity" means a "specified foreign entity" or a "foreign-influenced entity."  26 U.S.C. § 7701(51)(A)(i).  A "specified foreign entity" includes "a foreign controlled entity."  26 U.S.C. § 7701(51)(B)(v).

108.    The term "material assistance from a prohibited foreign entity" means, with respect to any energy storage technology, "a material assistance cost ratio which is less than the threshold percentage applicable under subparagraph (B)."  26 U.S.C. § 7701(a)(52)(A).

109.    The applicable "material assistance cost ratio" ("MACR") percentages are listed in subparagraph (B) and are determined based on the year when construction begins.  26 U.S.C. § 7701(a)(52)(B).  Specifically, the threshold minimum percentage for energy storage technology is 55% MACR for construction beginning in 2026; 60% MACR for construction beginning in 2027; 65% MACR for construction beginning in 2028; 70% MACR for construction beginning in 2029; and 75% MACR for construction beginning in 2030 or thereafter.  26 U.S.C. § 7701(52)(B).

110.    In addition, Section 48E(a)(3)(B), as amended, imposes escalating adjusted percentage thresholds for the 10-percentage-point domestic content bonus:  40% for construction beginning before June 16, 2025; 45% for construction beginning between June 16 and December 31, 2025; 50% for construction beginning during calendar year 2026; and 55% for construction beginning after December 31, 2026.  26 U.S.C. § 48E(a)(3)(B).

(d)    Copper's Misrepresentations Regarding The Section 48E Tax Credit

111.    Copper has made false and misleading statements in interstate commerce regarding Charlie's eligibility for the Section 48E Clean Electricity Investment Credit ("48E Credit") under the Internal Revenue Code.

112.    Copper's advertising related to Charlie's eligibility for the 48E Credit has been and continues to be false and/or materially misleading for several reasons.

32

113.    First, Copper advertises on its website as of the date of this filing that Charlie "qualifies" for the 48E Credit.[9]

114.    Copper's advertising of Charlie as qualifying for the 48E Credit is false and misleading because its website, as of the date of this filing, continues to advertise the 48E Credit as available to purchasers of Charlie without any disclosures after the Act removed and/or substantially impaired Charlie's eligibility through the material assistance bar.

115.    Specifically, the definition of "prohibited foreign entity" covers a battery manufacturer organized and operating in China.

116.    On information and belief, Charlie is subject to Section 48E's material assistance bar because Copper's supply chain for Charlie involves material assistance from Chinese suppliers, which are prohibited foreign entities.

117.    As a result, Charlie is ineligible for the 48E Credit.

118.    Second, Copper has advertised and, as of the date of this filing, continues to advertise that the credit for Charlie starts at 30% and may increase to 40% or more.

119.    For example, as of the date of this filing, Copper's website provides:  "For multifamily buildings, Charlie qualifies for the Section 48E clean electricity investment credit, which covers battery energy storage systems" and that the credit "starts at 30% and can increase to 40% or more."[10]

---

[9]  https://copperhome.com/pages/charlie-rebates-and-incentives-information?srsltid=AfmBOoo73G1PnWTPT_HJA4UGvH1oD3reKoVzKiPf9rbUMlVYmwwl2sXa

[10]  https://copperhome.com/pages/charlie-rebates-and-incentives-information?srsltid=AfmBOoo73G1PnWTPT_HJA4UGvH1oD3reKoVzKiPf9rbUMlVYmwwl2sXa

120.   Copper's advertising is false and misleading because Charlie is not eligible for the base 30% credit to begin with, since that credit requires Charlie to meet the qualifications of Section 48E.   As alleged above, Charlie does not qualify for the 48E Credit.

121.   Moreover, to obtain the increased 40% tax credit under Section 48E, a product must both meet the qualifications of Section 48E that render it eligible for the 30% tax credit and satisfy additional domestic content requirements.

122.   Because Charlie does not qualify for the lower 30% tax credit under Section 48E, it also does not qualify for the increased 40% tax credit.

123.   Moreover, even if Charlie were eligible for the Section 48E's initial 30% base tax credit, Copper's advertising that Charlie may be eligible for the increased 40% tax credit is false and misleading because Charlie would not be eligible for the additional 10% bonus tax credit.

124.   Specifically, on information and belief, Charlie's battery, appliance housing, and other core components are all made in China and/or by Chinese suppliers.

125.   As a result, on information and belief, Charlie's purchasers would be unable to legally claim the domestic content bonus under Section 48E(a)(3)(B) regardless of when construction begins.

126.   Copper's representations regarding Charlie's eligibility for the 48E Credit are either false or, at minimum, misleading because they actually deceive, or have a tendency to deceive, consumers into believing that a substantial tax credit is available to offset their purchase of Charlie.

127.   Copper's misrepresentations actually deceive, or have a tendency to deceive, consumers.   Consumers viewing Copper's website may reasonably conclude that purchasing Charlie entitles them to a federal tax credit of 30% or more, despite the fact Charlie does not qualify for the 48E Credit.

34

128.    Copper's misrepresentations are material and are likely to affect consumer purchasing decisions because, on information and belief, consumers are more likely to purchase Charlie if they believe they will receive a 30% or greater tax credit on a $6,000 purchase price.

129.    If Copper did not misrepresent Charlie's eligibility for the 48E Credit, consumers would be less likely to purchase Charlie.

130.    If Copper did not misrepresent Charlie's eligibility for the 48E Credit, consumers would purchase alternative induction cooking solutions, such as the Impulse Cooktop.

131.    Copper's false and misleading advertising is disseminated to actual and prospective purchasers of Charlie through Copper's publicly accessible website for the purpose of influencing consumer purchasing decisions.

132.    Copper's false and misleading advertising about Charlie's eligibility for the 48E Credit harms Impulse because Copper and Impulse both develop, manufacture, and sell induction cooking products in the United States.  By falsely and misleadingly representing that Charlie is eligible for the 48E Credit, customers may be deceived into purchasing Charlie based on Copper's false representations that they are entitled to receive a tax credit in excess of $1,000 when they could purchase an Impulse Cooktop, which Impulse does not falsely advertise as being eligible for the 48E Credit.

C.    **Copper's False and Misleading Advertising Harms Impulse**

133.    On information and belief, the false and/or misleading statements disseminated by Copper regarding UL certification and the 48E Credit had and continue to have an effect on interstate commerce.

134.    As a result of Copper's acts of false and misleading descriptions of fact, false and misleading representations and unfair competition, Impulse has suffered, currently suffers, and will continue to suffer damage, including to its business, reputation and good will.

135.    As a direct and proximate result of Copper's false advertising, Impulse has suffered injury, including but not limited to lost sales and lost market opportunities.

136.    Pursuant to 15 U.S.C. § 1117, Impulse is entitled to damages for Copper's Lanham Act violations, an accounting for profits made by Copper based on its false and/or misleading statements, as well as recovery of costs of this action. Furthermore, Impulse is informed and believes, and on that basis alleges, that Copper's conduct was undertaken willfully and with the intention of causing confusion, mistake or deception, making this an exceptional case entitling Impulse to recover additional damages and reasonable attorney fees pursuant to 15 U.S.C. § 1117.

137.    Copper's false advertising will continue to harm Impulse, causing irreparable injury for which there is no adequate remedy at law, unless permanently enjoined by this Court pursuant to 15 U.S.C. § 1116.

**COUNTERCLAIM TWO**
**(Unlawful and Unfair Business Practices)**
**(Cal. Bus. & Prof. Code § 17200 *et seq.*)**

138.    Impulse repeats and re-alleges the allegations set forth above as if fully stated herein.

139.    California Business and Professions Code Section 17200 prohibits any "unlawful, unfair or fraudulent business act or practice" and any "unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

140.    Copper has engaged and continues to engage in unlawful, unfair, and fraudulent business practices by publishing false and misleading statements regarding the availability of the 48E Credit to multifamily developers purchasing Charlie.

141.    Copper's conduct regarding the availability of the 48E Credit to multifamily developers purchasing Charlie constitutes "unlawful" business practices because it violates the Lanham Act, 15 U.S.C. § 1125(a), as alleged above in paragraphs 88-133.

142.    Copper's conduct constitutes "unfair" business practices because: (a) the harm to consumers and competitors from being misled about material economic incentives outweighs any conceivable benefit of Copper's advertising practices; (b) the conduct offends established public policy against deceptive advertising; and (c) consumers and competitors cannot reasonably avoid the harm caused by Copper's misrepresentations.

143.    Copper's conduct constitutes "fraudulent" business practices because its misrepresentations about the 48E Credit are likely to deceive a reasonable consumer into believing a substantial federal tax credit is available on their purchase when Charlie is not eligible for the 48E Credit.

144.    As discussed in paragraphs 124-126, Copper's deception is material to consumer purchasing decisions.

145.    Copper knows or reasonably should know that its representations regarding Charlie's eligibility for the 48E Credit are false or misleading as applied to its typical consumer base.

146.    Additionally, Copper has engaged and continues to engage in unlawful, unfair, and fraudulent business practices by publishing false and misleading statements regarding Charlie's compliance with UL 858, UL 1973, and UL 9540A and the applicability of UL 858 to Charlie in many jurisdictions.

147.    Copper's conduct regarding UL certification constitutes "unlawful" business practices because it violates the Lanham Act, 15 U.S.C. § 1125(a), as alleged above in paragraphs 10-87, 129-133.

148.    Copper's conduct constitutes "unfair" business practices because: (a) the harm to consumers and competitors from being misled about UL standards outweighs any conceivable benefit of Copper's advertising practices; (b) the conduct offends established public policy against deceptive advertising; and (c) consumers and competitors cannot reasonably avoid the harm caused by Copper's misrepresentations.

149.    Copper's conduct constitutes "fraudulent" business practices because the misrepresentations about Charlie's UL certification are likely to deceive a reasonable consumer into believing that they are purchasing a product that complies with UL standards, including UL 858 and UL 1973, when in fact Charlie is not certified to either UL 858 or UL 1973.

150.    Copper's conduct constitutes "fraudulent" business practices because its misrepresentations about Charlie's UL certification are likely to deceive a reasonable consumer into believing Charlie is certified to UL 858, UL 1973, and UL 9540A when Charlie is not certified to any of 858, UL 1973, or UL 9540A.

151.    Additionally, Copper's conduct constitutes "fraudulent" business practices because its misrepresentations about Charlie's UL certification are likely to deceive a reasonable consumer into believing Charlie does not need to be certified to UL 858 when in fact UL 858 certification is required for electric ranges in most, if not all, states.

152.    As discussed in paragraphs 52-54, 60-61, 75-76, and 85-86, Copper's deception regarding UL certification is material to consumer purchasing decisions.

153.    Copper knows or reasonably should know that its representations regarding Charlie's UL certifications are false or misleading as applied to its typical consumer base.

154.    Copper has willfully and knowingly disseminated the foregoing advertisements. Copper knows or should know that its representations about Charlie are false, deceptive and misleading.

155.    As a direct and proximate result of Copper's unlawful, unfair, and fraudulent conduct, Impulse has suffered injury, including but not limited to lost sales and lost market opportunities.

## PRAYER FOR RELIEF

Based on the foregoing, Impulse respectfully requests that this Court enter judgment in its favor and against Copper, as follows:

(a)    Finding that Copper is liable for false advertising in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), with respect to its marketing and advertising of its offerings and its comparisons of its offerings to Impulse's;

(b)    Finding that Copper has willfully, knowingly, and deliberately committed acts of false advertising and that this is an "exceptional case" under § 35 of the Lanham Act, 15 U.S.C. 1117(a);

(c)    Finding that Copper has violated California's Unfair Competition Law, Cal. Bus. Code § 17200 et seq., which prohibits unfair competition;

(d)    An award of actual damages to Impulse in an amount to be proven at trial;

(e)    An award of restitution and disgorgement of ill-begotten profits;

(f)    An award pursuant to § 35 of the Lanham Act, 15 U.S.C. § 1117, of an accounting of Copper's profits resulting from its Lanham Act violations and a disgorgement of those profits in an amount to be proven at trial;

39

(g)      Preliminary and permanent injunctions barring Copper from continuing to engage in deceptive and unfair advertising practices aimed at Impulse or Impulse's customers or prospective customers;

(h)      Preliminary and permanent injunctive relief requiring Copper to engage in a corrective advertising campaign to correct its false and misleading advertising;

(i)      Attorneys' fees, costs and expenses that Impulse incurred in this action;

(j)      An award of prejudgment and post-judgment interest; and

(k)      Such other and further relief as the Court may deem just and proper.

Dated: June 11, 2026                                Respectfully submitted,

OF COUNSEL:                                         */s/ Jared W. Newton*
                                                    Jared W. Newton (#7519)
Steven Cherny (*pro hac vice* forthcoming)          QUINN EMANUEL URQUHART
Gavin S. Frisch  (*pro hac vice* forthcoming)         & SULLIVAN LLP
111 Huntington Avenue, Suite 520                    500 Delaware Avenue, Suite 1400
Boston, MA 02199                                    Wilmington, DE 19801
Tel: 617-712-7100                                   Tel: 302-302-4076
Fax: 617-712-7200                                   Fax: 302-302-4010
Email: stevencherny@quinnemanuel.com                Email: jarednewton@quinnemanuel.com
Email: gavinfrisch@quinnemanuel.com

                                                    *Attorneys for Impulse Labs, Inc.*